UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.:

DAYNA CHRISTINE CLAWSON, as Personal
Representative of the Estate of
RICKY KEVIN WHIDDEN

       Plaintiff,

vs.

JUSTIN RIGNEY, in his Individual Capacity,
and PALM BEACH COUNTY SHERIFF'S OFFICE
[RIC BRADSHAW in his capacity as Sheriff
of Palm Beach County, Florida]

       Defendant.

_____/

## COMPLAINT

Comes Now, Plaintiff, DAYNA CHRISTINE CLAWSON, as Personal Representative of the Estate of RICKY KEVIN WHIDDEN, deceased (hereinafter "WHIDDEN"), by and through the undersigned attorneys and hereby files her Complaint against JUSTIN RIGNEY, in his Individual Capacity (hereinafter "RIGNEY"), for acts that occurred during the course and scope of his employment with Defendant, the PALM BEACH COUNTY SHERIFF'S OFFICE (RIC BRADSHAW, in his official capacity as Sheriff of Palm Beach County (hereinafter "Defendant PBSO").

## INTRODUCTION

This case involves another in a long line of unjustified police shootings by officers of PBSO, in which JUSTIN RIGNEY acted consistently with PBSO practices, policies, procedures, and customs of condoning aggressive police tactics, failing to identify, train, discipline, or otherwise properly supervise officers who have engaged in excessive and unjustified use of force

1

on persons who suffer from mental illness, and ratifying the conduct of those officers with little or no investigation. This civil action arises from an incident that occurred on December 31, 2016, following the shooting and killing of RICKY KEVIN WHIDDEN, a 42 year old male who suffers from Schizophrenia. Defendant PBSO's officers had responded to a call for help from WHIDDEN's mother to calm WHIDDEN down and get him some immediate medical attention. Instead, after over forty minutes (40) during which WHIDDEN's mother remained on the phone with PBSO, Defendant RIGNEY and other deputies of Defendant PBSO responded to the scene, immediately escalated the situation, and shot WHIDDEN in the back multiple times as he was running away from the deputies. After WHIDDEN was shot multiple times and lay motionless on the ground, Defendant RIGNEY released his service K-9 to bite WHIDDEN's face. WHIDDEN is survived by three minor children.

Plaintiff brings federal constitutional claims against RIGNEY, in his Individual Capacity for committing acts, under color of law, which deprived Plaintiff of his rights under the Constitution and the laws of the State of Florida by shooting and using deadly, excessive and unreasonable force during the encounter and arrest of WHIDDEN. Further, Plaintiff brings federal constitutional claims against PBSO as the supervisory entity responsible for the conduct, training, and supervision of the Sheriff's Deputies under its charge. PBSO failed to properly train Sheriff's Deputies in the appropriate methods, proper procedures, and protocols with respect to how to interact and subdue a mentally ill individual and how to utilize appropriate levels of force during encounters. PBSO had a policy and custom that constituted deliberate indifference to WHIDDEN's Constitutional rights, and PBSO's policy and custom deprived WHIDDEN of his rights under the Constitution and the laws of the State of Florida resulting in the use of deadly, excessive and unreasonable force during the arrest of WHIDDEN.

2

Additionally, Plaintiff brings a Wrongful Death action against Defendant PBSO and Defendant RIGNEY pursuant to the Florida Wrongful Death Act for the actions of Defendant RIGNEY in the wrongful killing of WHIDDEN.

## JURISDICTION AND VENUE

1. Plaintiff in this action seeks relief under the Fourth and Fourteenth Amendments of the United States Constitution, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, including compensatory damages, punitive damages, costs, and attorney's fees, pursuant to 42 U.S.C. § 1988 and the Florida Wrongful Death Act.

2. Venue is proper in this circuit because the Plaintiff resides in Palm Beach County, Florida and the facts that form the basis of this action happened in Palm Beach County, Florida.

3. All conditions precedent to the maintenance of this action, including those notice requirements set forth in Florida Statute § 768.28, have been performed, have occurred prior to its institution, or have been waived.

## PARTIES

4. At all times material hereto, Plaintiff, DAYNA CHRISTINE CLAWSON, as Personal Representative of the Estate of RICKY KEVIN WHIDDEN, deceased, is and was a citizen and resident of Palm Beach County, State of Florida, is otherwise sui juris, and has been duly appointed as the Personal Representative of the Estate of RICKY KEVIN WHIDDEN, deceased. [See Letters of Administration attached hereto as Exhibit 'A"]. DAYNA CHRISTINE CLAWSON is the biological mother of WHIDDEN's three minor children, G.W., B.W, and P.W, and, together with their minor children, resided with WHIDDEN at the time of his death.

3

5.      At all times material hereto, the statutory beneficiaries of the Estate of RICKY KEVIN WHIDDEN, deceased, are Dianne & Owen Whidden, surviving parents and G.W., B.W, and P.W, Minor Children.

6.      Plaintiff, DAYNA CHRISTINE CLAWSON, as Personal Representative of the Estate of RICKY KEVIN WHIDDEN, deceased, brings this action for the decedent's wrongful death and for violation of decedent's constitutional rights on behalf of all individuals entitled to a claim and for the Estate of RICKY KEVIN WHIDDEN, deceased.

7.      At all times material hereto, Defendant JUSTIN RIGNEY was employed as a Certified Sworn Law Enforcement Officer for Defendant PALM BEACH COUNTY SHERIFF'S OFFICE, and was acting under the direction and control of Defendant PALM BEACH COUNTY SHERIFF'S OFFICE, in such capacity as an agent, servant, and employee of the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE.  Upon information and belief, and at all times material hereto, Defendant RIGNEY participated in the unconstitutional violations and other wrongful acts that occurred on December 31, 2016, at which time he was acting within the course and scope of his employment under color of state law. RIGNEY is and was a citizen of the State of Florida and is otherwise sui juris.

8.      At all times material hereto, PBSO [Ric L. Bradshaw, in his capacity as Sheriff of Palm Beach County, Florida] is an entity, corporate and political, duly organized under the laws of the State of Florida. PBSO is the governmental entity responsible as a matter of law, for the actions of its officials, agents and employees and was responsible for their training, supervision and conduct. PBSO is also responsible for ensuring that its police personnel obey the laws of the State of Florida and ensuring that its rules and regulations are followed and enforced.

9.      Plaintiff sues RIGNEY in his Individual Capacity.

## FACTUAL ALLEGATIONS

### *Events which Occurred on December 31, 2016*

10.     WHIDDEN was a 42 year-old who suffers from mental health disorders including schizophrenia and bipolar disorder. In November 2014, WHIDDEN suffered his first schizophrenic episode, after which WHIDDEN was hospitalized and diagnosed with schizophrenia and bipolar disorder. Additionally, he was given medication to control the condition.

11.     On December 30, 2016, WHIDDEN went to sleep in a spare bedroom at his parents' house, located at 13289 Compton Road, Loxahatchee, Florida 33470, as he was staying there through the New Year. DAYNA CHRISTINE CLAWSON and their minor children had traveled out of state for the holidays to visit DAYNA CHRISTINE CLAWSON's family.

12.     In the middle of the night/early morning hours of December 31, 2016, WHIDDEN experienced symptoms and manifestations of schizophrenia. WHIDDEN awoke his parents, Owen and Dianne Whidden, and informed them that he was having suicidal thoughts and was going outside.

13.     Dianne Whidden, knowing that WHIDDEN suffered from mental health, contacted emergency dispatch requesting immediate medical assistance. She informed them of the statements made by WHIDDEN and that he exited the house carrying a steak knife. She additionally informed the dispatcher of WHIDDEN's mental health issues and made clear that her son required professional response to avoid escalating her son's mental health condition and to provide medical attention to her son.

14.     WHIDDEN exited the home and sat on a lawn chair in the open yard area directly in front of the front entrance of the Whidden home where he remained until deputies for Defendant PBSO arrived on scene.

5

15. Dianne Whidden, who is paralyzed from the waist down, also exited the home, in her wheelchair, and continued to speak with emergency dispatch until Defendant PBSO arrived on scene. Dianne Whidden continued to relay her observations of her son, to include that WHIDDEN was sitting on a lawn chair in the open yard in front of the Whidden home. Owen Whidden also exited the home and was in the open yard watching WHIDDEN as they waited for assistance and medical attention.

16. At no time prior to PBSO's arrival did WHIDDEN make any threatening or aggressive gestures to his parents or any other person. Rather, WHIDDEN remained sitting outside on a chair on the porch.

17. After over forty (40) minutes, Deputies for PBSO responded to the Whidden home. Despite the warnings and obvious need for appropriately trained intervention, Defendant PBSO dispatched deputies who were improperly qualified and trained or otherwise were incapable of properly and appropriately addressing the mental health episode for which Dianne Whidden summoned emergency response.

18. At the time PBSO deputies arrived at the Whidden home, WHIDDEN was not in the near proximity of any other persons, and did not pose a danger to any other person. Instead, contrary to professional police training and intervention, PBSO Deputies, including Defendant RIGNEY, created a conflict with a person they knew was not mentally and emotionally sound, when they aggressively descended upon WHIDDEN in what can only be described as a "tactical swat assault."

19. After observing the PBSO Deputies, including Defendant RIGNEY, rapidly and aggressively approaching him upon arrival at the Whidden home with a Police K-9, WHIDDEN

slowly began backing away from the Whidden home and towards an open portion of the Whidden's 2.5 acre lot, away from any other person or home in the near vicinity.

20.     Rather than take matters to deescalate the situation and despite WHIDDEN not presenting any danger to any person, let alone officer, PBSO Deputies, including Defendant RIGNEY and Defendant RIGNEY's assigned Police K-9, began a tactical assault running towards WHIDDEN with their guns drawn and pointed at WHIDDEN. The PBSO Deputies additionally were shining their flashlights on WHIDDEN blinding his view.

21.     WHIDDEN, continued backing away from the deputies towards the edge of his property wherein he stepped over a bush towards an area containing trees and a small pond. Again, other than the PBSO Deputies sprinting towards WHIDDEN, there were no other individuals, homes, or other potential risks within the area where WHIDDEN was walking.

22.     PBSO Deputies without warning or justification opened fire at the back of a retreating WHIDDEN first striking him in the chest with at least one (1) non-lethal bullet knocking him to the ground.

23.     Fearful of the PBSO Deputies approaching with guns drawn and led by a Police K-9, and after already being struck in the chest by at least one (1) non-lethal bullet, WHIDDEN began running further away from the officers.

24.     As WHIDDEN attempted to stand up and run from the bullets being directed at him, Defendant RIGNEY, and potentially other deputies of Defendant PBSO, discharged his PBSO issued firearm striking WHIDDEN from behind with lethal bullets three (3) times. The bullets struck WHIDDEN in his arms and back.

25.     After striking WHIDDEN with three bullets, and as WHIDDEN's laid faced down and motionless on the floor, Defendant RIGNEY and the other PBSO deputies approached

WHIDDEN and placed handcuffs on a motionless WHIDDEN. Defendant RIGNEY thereafter released his police K-9 and instructed him to attack WHIDDEN. Defendant RIGNEY and the other PBSO deputies allowed RIGNEY's police K-9 to viciously chew and bite at WHIDDEN's face.

26.     The entirety of the events was less than forty-five (45) seconds and was witnessed by Owen Whidden and Dianne Whidden. Owen Whidden watched helplessly from his front yard witnessing the entirety of the actions of Defendant PBSO which culminated in WHIDDEN's senseless and unjustified death. Dianne Whidden sat helplessly in her wheelchair outside in the front of the house as her son was killed by RIGNEY.

27.     In an effort to cover up their illegal use of force, unlawful detention, unlawful arrest, improper handling of the incident involving a mentally ill person, and overall gross negligence, which resulted in the improper use of excessive force, RIGNEY with the potential assistance of other PBSO Deputies fabricated an elaborate story about WHIDDEN lunging at the deputies with a knife in hand forcing RIGNEY to open fire.

28.     The conduct of Defendant RIGNEY occurred under the color of State Law.

29.     PBSO released a statement to the media from the scene of the shooting just hours after the shooting and prior to the completion of the investigation by the Violent Crimes Division of PBSO and by Internal Affairs and prior to the return of any forensic evidence reports. This statement was made with a complete disregard of accuracy, transparency, and completeness and was solely meant to ensure that the first statement to the public was from PBSO proclaiming that their deputies' actions were justified. The official statement released by PBSO indicated as follows:

> Just before 2:00 am this morning, deputies responded to a report of a male armed with a knife threatening himself and his family members in the 13000 block of Compton Road, Loxahatchee. Deputies arrived on scene and attempted to negotiate with the male. The male refused to comply with deputies commands. A PBSO

deputy used non-lethal weapon striking the male and knocking him down. When deputies approached the male in attempt to take him into custody he jumped up and lunged at the deputies. One deputy discharged his firearm striking the male.

Palm Beach County Fire Rescue personnel responded and declared the male to be deceased.

30.     The evidence discovered on scene, along with a neighbor's surveillance video which captures the entire event, completely disproves Defendant RIGNEY's allegations and Defendant PBSO's public statements that WHIDDEN was threatening, that PBSO deputies attempted to "negotiate" with WHIDDEN, that commands to comply were issued to WHIDDEN, that Deputies approached WHIDDEN in an attempt to take him into custody following the firing of non-lethal bullets, and that WHIDDEN "jumped up and lunged at deputies" with a knife. The evidence and surveillance video make clear that no negotiation occurred nor were commands given to WHIDDEN, particularly before the firing of any weapons. Rather, the evidence and video make clear that WHIDDEN was shot with non-lethal force as he backed away in the opposite direction of the responding deputies. The evidence and video further make evident that WHIDDEN thereafter ran away from the deputies until he was shot three (3) times from behind while running away.

31.     Defendant PBSO's Internal Affairs in conjunction with FDLE launched an investigation into Defendant RIGNEY and the other responding deputies conduct. The investigation into the shooting has been completed by FDLE and referred to the State Attorney's Office. Despite the shooting having occurred over six (6) months ago, no results or findings from FDLE's investigation has been released. Due to the investigation still being "pending", PBSO has refused to release any reports, statements, or evidence obtained. The failure to complete the investigation in a timely matter or release any reports or official details is itself a direct result of PBSO'S insufficient policies and practices as set forth in detail below.

9

32.     Despite the six (6) month pending investigation into this incident and Defendant RIGNEY's conduct, RIGNEY was only placed on administrative leave for five (5) days.

33.     Due to the evidence and surveillance video which clearly disprove Defendants RIGNEY's and PBSO's version of events, Defendant RIGNEY's lack of fear that any of his colleagues or supervisors would question his version of events or would find his actions improper and report him for improper conduct, the fact that PBSO through its immediate public statement cleared RIGNEY of any wrongdoing, the fact that Defendant PBSO has failed to complete an investigation into this matter in a timely manner, and the lack of any other discipline or consequences towards Defendant RIGNEY who wantonly violated WHIDDEN's rights, it is clear that Defendant RIGNEY's actions reflect a custom, policy, and practice of Defendant PBSO.

34.     Since none of the other responding deputies reported anything improper or unusual to their superiors, it is clear that all the deputies who responded to the scene consider violation of rights and inflicting violence upon persons with mental illness that they encounter to be standard procedure and consistent with the policy, custom, practice, and training of Defendant PBSO.

35.     WHIDDEN's civil rights pursuant to the Fourth Amendment were violated with the use of excessive force by Defendant RIGNEY and Defendant PBSO when, instead of providing medical attention and crisis intervention, WHIDDEN was chased by Deputies and a Police K-9, forcibly shot at with non-lethal bullets striking WHIDDEN in the chest, forcibly shot with at least three (3) lethal bullets from behind striking WHIDDEN in the arms and back, and had his face viciously attacked by RIGNEY's Police K-9.

### *Retention of RIGNEY as a Deputy by Defendant PBSO*

36.     Defendant PBSO knew or should have known the dangerous propensity of Defendant RIGNEY to engage in unlawful conduct, including the use of excessive force and

10

conducting unlawful arrests, in his employ as an officer for the Defendant PBSO, based upon Defendant RIGNEY's prior unlawful conduct.

37.    Defendant PBSO was aware, or should have become aware, of problems with Defendant RIGNEY that indicated his unfitness for duty as a Certified Sworn Law Enforcement Officer.

38.    From 2006 until the date Defendant RIGNEY shot and killed WHIDDEN, Defendant RIGNEY had been involved in 73 use of force incidents that were investigated by internal affairs of Defendant PBSO. Of the 73 use of force incidents, 37 occurred between the year 2014 and the date of WHIDDEN shooting. Additionally, Defendant RIGNEY has also displayed his firearm during arrests 10 times throughout his tenure as a Deputy with Defendant PBSO. All 10 of these firearm displays occurred within a year of the shooting of WHIDDEN.

39.    Through PBSO's self-initiated policy which tracks use of force incidents by its deputies and requires the review of an deputy who is involved in six (6) use of force incidents within a year, PBSO was put on notice of Thirty-Five (35) different occasions that Defendant RIGNEY had been involved in six Use of Force incidents within the last year and that his decision to use force may need to be reviewed. The specific dates of these Thirty-Four Use of Force Alerts were 11/18/2008, 12/10/10, 5/25/11, 6/6/11, 11/17/11, 3/15/12, 5/1/12, 09/28/12, 4/22/14, 5/22/14, 6/2/14, 6/19/14, 7/3/14, 7/28/14, 7/29/14, 8/26/14, 10/17/14, 12/22/14, 1/5/15, 1/7/15, 1/14/15, 1/22/15, 3/31/15, 4/1/15, 6/19/15, 8/12/15, 12/11/15, 1/6/16, 5/4/16, 7/11/16, 7/13/16, 9/16/16, 10/14/16, 10/17/16, and 12/12/16. Of the Thirty-Five (35) different use of force alerts, 27 of the alerts occurred after 2014. On December 12, 2016, PBSO was alerted that RIGNEY had been involved in Eleven (11) use of force incidents in the last year. Notwithstanding the significant number of alerts and the increasing volume of use of force incidents, the reviewing supervisor for

Defendant PBSO continued to determine that Defendant RIGNEY's use of force was reasonable following each alert.

40.     Nearly every one of the 73 use of force incidents involved RIGNEY using physical force and/or commanding RIGNEY's Police K-9 to bite an arrestee.

41.     Additionally, Defendant RIGNEY has received over twenty citizen complaints regarding his failure to properly respond to calls, use of excessive force during arrests, and deployment of RIGNEY's Police K-9 when it was not needed.  Despite these repeated complaints, Defendant PBSO failed to take any action against Defendant RIGNEY to discipline, train, or otherwise correct this improper conduct.

42.     Each investigation into Defendant RIGNEY's misconduct was authorized by Defendant PBSO, through its chief policy maker Sheriff Bradshaw.

43.     Defendant PBSO was on notice at the time of this incident of Defendant RIGNEY's history of internal affairs complaints, use of force incidents and alerts, and citizen complaints.

44.     Despite multiple documented complaints of excessive force, abuse of authority, unprofessional conduct, and failure to adequately perform the duties of a sworn law enforcement officer, Defendant PBSO has made no effort to discipline or otherwise correct Defendant RIGNEY, due to the custom, practice, and policy of failing to discipline officers following misconduct and using unnecessary excessive force during arrests.

45.     The pattern of excessive force has continued in the six (6) months following the date Defendant RIGNEY shot and killed WHIDDEN. Defendant RIGNEY had been involved in five (5) additional use of force incidents that were investigated by internal affairs of Defendant PBSO. Additionally, Defendant RIGNEY has also displayed his firearm during arrests two (2) additional times following the shooting of WHIDDEN.

46.     The most recent use of force incident (Case # 17-044) resulted in Defendant RIGNEY again being placed on administrative leave from May 30, 2017 until June 7, 2017.

47.     Additionally, supervisory officers with Defendant PBSO have expressed and documented concerns regarding Defendant RIGNEY's aggressive nature. In the months prior to this incident PBSO Sergeant Adam Fox verbally voiced his concerns to RIGNEY's direct supervisor and reported to him that RIGNEY was overly-aggressive, had a poor attitude, continuously relayed radio communications that were improper, unreliable, and/or untruthful, and had a tendency to take over incidents. On January 11, 2017, Sergeant Fox forwarded an email that was ultimately intended for PBSO Lieutenant John Hill to his PBSO Partner Sergeant Paul Rubino in an effort to jointly formerly document their concerns regarding RIGNEY. In said email written by Sgt. Fox, he indicated as follows:

> Lt. Hill,
> I am writing you regarding K-9 Deputy J. Rigney. In the last several months we have had interactions with him that have caused Sgt. Rubino and myself great concern over his activities as well as his tendency to take over calls and not allow us to handle our duties as Sergeants due to his inordinate amount of radio traffic.
>
> D/S Rigney frequently will come up on our radio channel and broadcast information that many times is not entirely true or extremely vague. The only reason that we can come up with for this is so that he can engage his K-9 into incidents that may not necessarily call for this action. Frequently on stolen cars he will immediately take over the incident calling for the Eagle, Stop Sticks and other resources before the Sergeant can get on the air. He will make unverified statements that the stolen auto is involved in other crimes when further investigation determines this is not true. In two stolen auto incidents when the car was located unoccupied, he has immediately ordered deputies to stand down and do surveillance. I have personally stopped this in one incident. If we can recover a victim's car, undamaged why put it at an unnecessary risk?
>
> D/S Rigney has also gotten on our channel broadcasting suspect vehicle information from another district incident when in fact no crime was verified or committed. When he was asked if he was behind the alleged vehicle he was in District 14, nowhere near District 3 and had no direct involvement in the incident, he was simply "monitoring' from his scanner.

13

It has come to the point that when he comes up on our channel, Sgt. Rubino and I immediately brace ourselves for what he will generate and whether it is actually reliable. Deputies do not like to go on calls with him as his aggressive nature makes them uncomfortable and he will demonstrate poor attitude on the radio if deputies do not do exactly what he wishes. D/S Rigney will start an incident then leaves without offering assistance or doing any related paperwork.

I have spoken to Sgt. G. Schetine months ago but I do not feel that it was addressed. Sgt. Rubino and I understand that we cannot restrict a K-9 to where they go and when a need arises a K-9 is a K-9. But his over aggressive behavior and unreliable information provided concerns us a great deal and concerns us every time he comes up on the channel.
Sgt. Adam Fox
Palm Beach County Sheriff's Office

48.     An Incident Review (IR17-100) into the allegations contained with Sgt. Fox's and Sgt. Rubino's joint email was not initiated until March 23, 2017. According to a Memorandum dated March 24, 2017, this email was provided to the Department of Internal Affairs by the Department of Legal Affairs "to determine if any policy violation(s) occurred."

49.     On May 9, 2017, the Incident Review determined that no further action or discipline was required as to Defendant RIGNEY. Sgt. Fox was also subjected to an incident review despite only voicing his concerns through proper channels.

50.     Despite Defendant PBSO being on notice of the problems with Defendant RIGNEY's fitness as a deputy, it failed to properly investigate said allegations of misconduct and failed to take any corrective action.

51.     Defendant RIGNEY's past employment history demonstrates a proclivity of endangering the general public and individuals he arrests as well as a complete disregard for the duties and responsibilities of a sworn law enforcement officer. In the instant matter, those same tendencies resulted in the excessive use of force utilized against Plaintiff and the false and misleading statements made by RIGNEY in his police reports.

***Common Practice for PBSO***

52.     On a daily basis, PBSO Deputy Sheriffs come into contact with persons who suffer from mental illness during their patrolling duties. Despite this daily contact, PBSO made no effort to adequately train and supervise said deputies. In order to adequately handle the certainty of police contact with these persons who suffer from mental illness, PBSO is charged with supplying the public with a police force that is adequately trained and equipped to handle calls dealing with persons who suffer from mental illness.

53.     At all times material hereto, PBSO was aware that there needed to be effective supervisory and command structure in place to deal with the problem of responding to incidents with persons who suffer from mental illness. PBSO failed to provide adequate supervision of its deputies in the field when said deputies encounter persons who suffer from mental illness.

54.     Experts consistently hold that mentally ill people are not violent, and they are more likely to be victims of crime than perpetrators.[1]

55.     Nationally, half of the people who are shot and killed by police officers are mentally ill.[2]

56.     At all times material hereto, PBSO was responsible for adopting and implementing the rules and regulations specifically in relation to hiring, screening, training, supervising, controlling, disciplining, and assigning deputies to their respective duties within Palm Beach County, Florida.

57.     PBSO has maintained a custom of excessive force in executing arrests by its sworn law enforcement officers. At all times material hereto, under PBSO General Order 500.01 for Use

---

[1] *Seminars to teach Mental Health First Aid*, Sun Sentinel, February 20, 2015, http://www.sun-sentinel.com/local/ palm-beach/boca-raton/fl-mental-health-first-aid-20150220-story.html.
[2] Reported in 2014 by the Treatment Advocacy Center and the National Sheriff's Association, *reported    at*    http://www.businessinsider.com/more-than-half-of-suspects-shot-and-killed-by-police-are-mentally-ill-2015-3.

of Non-Deadly/Less Lethal Force, officers may use only the amount of force reasonably necessary to affect lawful objectives and can only escalate to the next level of force that is justified considering the amount of resistance given and the potential of injury of the subject by using that type of control.

58.     PBSO's actions in this case and previous similar situations indicate a policy and custom of indifference to the rights of persons who suffer from mental illness they encounter or arrest and a failure to train properly and/or supervise their officers in how to deal with persons who suffer from mental illness they encounter or arrest. PBSO's refusal to adequately train its Deputies in how to interact with persons who suffer from mental illness and its failure to supervise those deputies has resulted in the infliction of excessive violence upon persons who suffer from mental illness and the violation of their constitutional rights. This lack of training and supervision causes these ill-trained and ill-equipped deputies to resort to the use of excessive force as their only alternative.

59.     PBSO Deputies have increasingly used deadly and excessive force in situations where the use of such force was entirely unjustified and where the conduct of the officers created dangers that would otherwise have not existed and contributed to the claimed need to use force. Specifically, there have been an increasing and alarming number of similar incidents of "officer involved shootings" in which PBSO Deputies have shot members of the public, falsely arrested members of the public, and/or seriously injured or endangered the public by the intentional and/or negligent misconduct by Deputies. Said serious incompetence or misbehavior has been general or widespread throughout the department. A review of the Internal Affair Investigations of these incidents shows a conscious disregard to the facts and circumstances surrounding each incident and a blanket justification of the actions of the deputies involved.

60.     Further, there has been a pattern of similar incidents in which persons who suffer from mental illness have been injured or endangered by the intentional and/or negligent misconduct of PBSO Deputies, and/or that serious incompetence or misbehavior was general or widespread throughout the department.

61.     Evidencing a pattern of similar incidents and Defendant PBSO's awareness that its deputies are repeatedly being accused of violating constitutional rights for conduct similar to what occurred in the incident described above, examples of similar incidents that occurred prior to the incident alleged in this Complaint that either resulted in federal lawsuits alleging constitutional violations and/or the payment of settlement funds are as follows:

a.     On or about August 27, 2004, in West Palm Beach, Florida, undercover PBSO Deputies surrounded a vehicle containing three individuals accused of purchasing drugs from the undercover deputies. Deputy Joaquin Fonseca while sprinting toward the vehicle discharged his firearm claiming one of the individuals, Manu Henry, had a gun in his hand. The alleged gun was actually a beer bottle.  Despite a determination by State Attorney Barry E. Krischer that the shooting was in error, PBSO took no disciplinary action against Deputy Fonseca who inflicted this excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. Mr. Henry suffered a gunshot wound to the abdomen which resulted in a two week hospitalization. Following the incident, Mr. Henry brought forth a claim against PBSO which the Palm Beach Post reported was settled for $250,000.00.

b.     In *Cynthia Skwierc, as Personal Representative of the Estate of Christopher J. Skwierc v. William McArdle and Ric L. Bradshaw*; 50-2005-CA-0007009-XXXX-MB, Plaintiffs alleged that on or about July 28, 2003, in Lake Park, Florida, Deputy William

McArdle shot and killed a mentally ill teen, Christopher Skwierc, who was on his roof carrying a toy gun. Plaintiffs brought a Wrongful Death claim against PBSO and McArdle alleging that PBSO deputies used "inappropriately aggressive tactics" and were not properly trained to deal with people with mental illness when they confronted Mr. Skwierc. The plaintiff alleged that she had called 911 since her 18 year old son was experiencing a bipolar episode and requested immediate medical attention. When the PBSO Deputies arrived, Skwierc was on the roof holding a toy gun. The plaintiff alleged that she repeatedly screamed to the deputies that her son was holding a toy gun, was bipolar and suffering a manic episode. Deputy McArdle ignored these screams and shot Skwierc in the chest with a 12-gauge shotgun. At the time of the shooting McArdle was already under investigation for the vicious beating of a gay man and the failure to report the use of force to any supervisors. In the shooting of Skwierc, McArdle was cleared of wrongdoing and an investigation determined that McArdle followed all policies and procedures of PBSO. Deputy McArdle did not receive any discipline, training, or reprimand. The parties resolved this matter outside of court. The monetary settlement of $200,000.00 was reported in the Palm Beach Post.

c.    In *Vivica L. Sirmans, as Personal Representative of the Estate of Chester O. Washington, Jr., et al v. Ric L. Bradshaw and Derek A. Savage*; 50-2006-CA-010957-XXXX-MB, Plaintiffs alleged that on or about February 17, 2006, in Belle Glade, Florida, Deputy Derek Savage shot and killed Chester O. Washington, Jr. following a routine traffic stop.  Plaintiffs brought Excessive Force counts pursuant to 42 U.S.C. §1983 and wrongful death counts against PBSO and Deputy Savage. Plaintiffs alleged that Deputy Savage ordered Mr. Washington out of the car where a dispute occurred.  Mr. Washington

attempted to run away from Deputy Savage and the other responding deputies. Deputy Savage discharged his firearm twice at Mr. Washington who had his back turned and was running away, striking him twice and killing him. Mr. Washington was unarmed and possessed no weapon. This was the second shooting by Deputy Savage in less than four (4) years. A determination was made by Internal Affairs that Deputy Savage followed all policies and procedures of PBSO and was cleared of all wrongdoing in this fatal shooting. Deputy Savage did not receive any discipline, training, or reprimand. The parties resolved this matter outside of court. A Petition to Approve Settlement Involving Minor Children was filed indicating that the total gross-settlement between Plaintiffs and Defendants was $200,000.00, which was the total amount allowable under sovereign immunity laws. The settlement was also reported in the Palm Beach Post.

d.      On or about April 19, 2006, in Margate, Florida, PBSO Deputies participated in a highway car chase of a male suspect accused of kidnapping which involved police officers from multiple agencies. PBSO Deputy Michael Thornton confused Shirley White as being a suspect and opened fire on her vehicle. Ms. White was simply driving to work at a Target when she attempted to swerve away from the police chase. PBSO deputies surrounded her vehicle and opened fire mistaking her vehicle as being involved in the chase.  PBSO took no disciplinary action against Deputy Thornton who inflicted this excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. Ms. White suffered a non-life threatening gunshot wound which resulted in her requiring medical transport and hospitalization. Following the incident, Ms. White brought forth a claim against PBSO which the Palm Beach Post reported was settled for $100,000.00.

e.     In *the Estate of John Garczynski v. Ric L. Bradshaw, et al*; 50-2009-CA-006886-XXXX-MB, Plaintiffs alleged that on or about March 9, 2005, in Boca Raton, Florida, PBSO Deputies opened fire on John Garczynski, a severely depressed and suicidal thirty-seven year old man with a gun to his head, after a PBSO Deputy stumbled startling other officers.  Plaintiffs brought a Wrongful Death claim against PBSO and the individual deputies alleging that the deputies violated Garczynski constitutional rights. PBSO took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with persons who suffer from mental illness. The PBSO Deputies involved admitted that they had received little-to-no-training in the handling of suicidal subjects, and were not aware of PBSO having any crisis intervention team or department to handle suicidal persons. The parties resolved this matter outside of court. The monetary settlement of $100,000.00 was reported in the Palm Beach Post.

f.     In *Richard Furtado, as Personal Representative of the Estate of Marilou Forrest v. Jason Yun Chung Law and Ric L. Bradshaw*; 50-2007-CA-006922-XXXX-MB, Plaintiffs alleged that on or about March 27, 2006, in Boca Raton, Florida, Deputy Jason Yun Chung Law shot and killed a mentally ill woman, Marilou Forrest, following a call from her husband to PBSO requesting them to transport his wife to a mental health facility, pursuant to a Baker Act certificate.  Plaintiffs brought Excessive Force counts pursuant to 42 U.S.C. §1983 and wrongful death counts against PBSO and Deputy Law. The plaintiff alleged that PBSO was aware that Ms. Forrest was in a "persistent severe delusional and agitated state" and had a "long history of severe depression." Three deputies responded to

20

the scene and were met by Ms. Forrest's husband who informed them that Ms. Forrest was in the home, was suffering from delusional paranoia, and may have a knife. The deputies entered the bathroom with their guns drawn and who began running at the deputies with a knife. Deputy Law fired his service weapon striking Ms. Forrest in the chest. The Plaintiff alleged that the PBSO deputies were not properly trained to handle a person suffering from mental illness and that the PBSO deputies used aggressive tactics that would have frightened a mentally ill person and escalate the situation. PBSO took no disciplinary action against Deputy Law who inflicted this excessive force, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.  This matter was dismissed by the trial court due to the failure by plaintiff to show multiple prior similar incident that would have placed PBSO on notice of a need for more training in how to handle persons suffering from illness.

g.      In *Andy Lee Jackson, II, v. Sergio Montesino and Ric L. Bradshaw*; 50-2007-CA-006922-XXXX-MB, Plaintiffs alleged that on or about June 9, 2007, in Lake Worth, Florida, Deputy Sergio Montesino shot and critically wounded Andy Lee Jackson, II, despite Jackson being unarmed and fully compliant with Deputy Montesino's commands. Plaintiffs brought Excessive Force counts pursuant to 42 U.S.C. §1983 and state law counts against PBSO and Deputy Montesino. The plaintiff alleged that Deputy Montesino shot him in the head after fully complying with orders to raise his hands and despite not having committed any crime nor possessing any weapon.  PBSO took no disciplinary action against Deputy Montesino who inflicted this excessive force, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. Mr. Jackson suffered permanent injuries as a result of being

shot in the head. The parties resolved this matter outside of court. The monetary settlement of $125,000.00 was reported in the Palm Beach Post.

     h.     On or about March 15, 2008, in West Palm Beach, Florida, Deputy Samuel Peixoto shot an unarmed Marino Ramos seven times during a routine traffic stop, then stabbed himself to make it look like he had been attacked. Peixoto was still under investigation for another shooting four months earlier, in which he fired 12 rounds blindly into the woods then waited hours to report it. PBSO initially cleared Peixoto for the shoot and indicated that he was acting in self-defense. Following indications that Peixoto was going to be indicted for manslaughter and evidence tampering, Peixoto committed suicide. Only after Peixoto committed suicide did PBSO revisit the shooting and determine it to be unjustified. The Palm Beach Post reported a lawsuit on behalf of the Estate of Marino Ramos for the wrongful killing of Marino Ramos was settled out of court for $300,000.00.

     i.     In *Marie Debrosse as Personal Representative of the Estate of Ruben Debrosse v. Ric L. Bradshaw and Eric A. Bethel*; 50-2009-CA-005422-XXXX-MB, Plaintiffs alleged that on or about August 6, 2008, in Royal Palm Beach, Florida, Deputy Eric A. Bethel shot and killed a sixteen year old boy, Ruben Debrosse, after Debrosse accidentally backed into the rear bumper of Deputy Bethel's patrol car.  Plaintiffs brought Excessive Force and Wrongful Death counts against PBSO and Deputy Bethel. The plaintiff alleged that after the car appeared to accidentally bump into the police vehicle, causing no damage, Deputy Eric Bethel shot and killed the sixteen year-old unarmed driver. The PBSO Deputy later claimed to be fearful that the boy was trying to run him over. PBSO took no disciplinary action against Deputy Brethel who inflicted this deadly and excessive force, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary

excessive force during arrests. The parties resolved this matter outside of court. The monetary settlement of $200,000.00 was reported in the Palm Beach Post.

     j.      In *Patty Phillips as Personal Representative of the Estate of Adam Phillips, v. Ric L. Bradshaw, Cpl Richard Logsdon and Lt. Edward Worthington*; 50-2010-CA-028903-XXXX-MB, Plaintiffs alleged that on or about December 21, 2008, in West Palm Beach, Florida, multiple PBSO deputies surrounded a vehicle containing a mentally unstable individual, Adam Phillips, and thereafter shot and killed Phillips.  Plaintiff brought Excessive Force counts pursuant to 42 U.S.C. §1983 and Wrongful Death counts against PBSO and the involved deputies. PBSO Deputies had responded to a mother's call reporting that her son, a mentally unstable individual who was addicted to drugs, had taken her vehicle. Despite the fact that the individual had no history of violence and was unarmed, a team of PBSO Deputies surrounded the vehicle and unjustifiably used excessive force, including deadly force, when they shot and killed the suspect when he refused to exit the vehicle. PBSO took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with persons who suffer from mental illness.   The parties resolved this matter outside of court. The monetary settlement of $75,000.00 was reported in the Palm Beach Post.

     k.      In *Alens Charles, v. Ric L. Bradshaw and Marco Flores*; 50-2010-CA-019110-XXXX-MB, Plaintiffs alleged that on or about June 16, 2009, in Lake Worth, Florida, Deputy Marco Flores shot and seriously injured Alens Charles who was unarmed and asleep in his car in the driveway of his residence.  The plaintiff brought Excessive Force counts pursuant to 42 U.S.C. §1983 as well as numerous state law counts against PBSO

and Deputy Flores. The complaint alleged that Deputy Flores responded to the residence of Charles where he was asleep in his car. Upon startling Charles to awake him, Charles shot up in his chair. Deputy Flores shot Charles in the arm alleging he saw a weapon in Charles' hand. Charles was unarmed and had committed no crime. The item alleged to be a gun was Charles' cell phone. PBSO took no disciplinary action against Deputy Flores who inflicted this deadly and excessive force, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The parties resolved this matter outside of court. The monetary settlement of $50,000.00 was reported in the Palm Beach Post.

l.      In *Annie Wilson as Personal Representative of the Estate of Jamil Murray v. Ric L. Bradshaw and Donald Smith*; 9:13-cv-80983-KLR, Plaintiffs alleged that on or about October 2, 2009, in Boynton Beach, Florida, Deputy Donald Smith shot and killed a Jamil Murray in the parking lot of a grocery store in which Murray was a recent patron. Plaintiffs brought Excessive Force and Wrongful Death counts against PBSO and Deputy Smith. The complaint further alleged that while off-duty and in plain clothes, Deputy Smith, also a patron at the local grocery store, exited the store and drove his patrol car to where Jamil Murray was standing in the parking lot. Deputy Smith, while approximately 30 feet from Murray, started shouting orders to which Murray was fully compliant. While complying with orders to remove a knife from his pocket and drop the knife on the floor, Deputy Smith suddenly and without warning fired multiple shots striking Murray in the abdomen. Murray died as a result of his gunshot wounds.  Despite eyewitness testimony that Murray was fully compliant and that Deputy Smith shot Murray without any provocation, PBSO took no disciplinary action against Deputy Smith who inflicted this

deadly and excessive force, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The parties resolved this matter outside of court. The monetary settlement of $80,000.00 was reported in the Palm Beach Post.

m.      On or about September 9, 210, in West Boynton, Florida, Deputy Timothy Reiger shot an unarmed David Bennett when he didn't get out of his car and appeared to reach for something. The Palm Beach Post reported a lawsuit on behalf of the Estate of David Bennett for the wrongful killing of David Bennett was settled out of court for $50,000.00.

n.      In *Montero v. Bradshaw and Nandlal*; 9:12-cv-80406-KLR(J. Ryskamp), Plaintiffs alleged that on April 9, 2010, Deputy Sheriff Ramesh Nandlal of PBSO shot an unarmed man, Richard Montero, four times from several yards away leading to his death. Plaintiffs brought Excessive Force counts pursuant to 42 U.S.C. §1983 against PBSO and Deputy Nandlal, as well as wrongful death and negligent training claims against PBSO. Plaintiffs alleged that while Montero was subdued and under the control of numerous deputies, Deputy Nandlal ordered the other deputies away and then without any warning shot Montero four times in the mid-section. A determination was made by Internal Affairs that Deputy Nandlal followed all policies and procedures of PBSO and was cleared of all wrongdoing in this fatal shooting. Deputy Nandlal did not receive any discipline, training, or reprimand. However, a jury sitting in Palm Beach County determined that "Ramesh Nandlal intentionally used excessive or unreasonably deadly force upon Richard Montero during his arrest" and awarded compensatory damages in the amount of $540.00.00 to the Estate of Richard Montero.

o.      In *Hutton v. Franqui, Stachelek, Bender, and PBSO*, Case No.4-81068-CIV-DIMITROULEAS/SNOW, Plaintiff brought claims against PBSO and the deputies involved for constitutional violations under 42 U.S.C. § 1983, battery, negligent use of a firearm, negligent retention, and negligent hiring. Plaintiffs alleged that, on October 10, 2010, the mother of Jeremy Hutton, a 17 year-old male who is severely mentally disabled, suffers from Down Syndrome, and has been declared legally and mentally incompetent, called PBSO to report that Hutton drove off in the family mini-van for the first time. Despite the fact that Hutton had no history of violence, was unarmed, and that the deputies were well aware of his mental and physical handicaps, PBSO deputies surrounded the vehicle and unjustifiably used excessive force when one of them discharged his firearm six (6) times while the mini-van was still moving away from the deputies. Hutton was struck by three bullets of these bullets. Deputy Franqui then performed a leg sweep maneuver, slammed Hutton on the ground, and handcuffed him. Yet another deputy then aggressively and forcibly slammed Hutton's head down into the pavement and held him down for over six (6) minutes refusing to provide medical care despite his obvious injuries. Determination was made by PBSO that such force was justified, and the deputies involved never received any additional training or reprimand. Notwithstanding this determination, discovery in that matter has revealed that PBSO conducted a training regarding this shooting which was used as a case study. The case study ultimately determined that Deputy Franqui improperly boxed in Hutton placing the deputy in a position where he was left with no decision but to improperly use deadly force. Notwithstanding this training case study, PBSO never provided any additional training or discipline to Deputy Franqui or the other deputies on scene and the Internal Affairs investigation was never updated. The parties resolved this

matter outside of court. The monetary settlement of $450,000.00 was reported in the Palm Beach Post.

p.      In *Adams v. Bradshaw and Custer*; Case No.9:14-CIV-80403-HURLEY/HOPKINS, Plaintiffs alleged that on May 17, 2012, Deputy Michael Custer of PBSO knowingly shot and killed Seth Adams, an unarmed man who was several feet away, not acting in an aggressive manner, and was not reaching for a weapon. Adams was able to crawl away despite being shot three times, but Deputy Custer refused to provide any medical attention and refused to allow responding family members to assist Adams. Plaintiffs brought § 1983 and Wrongful Death claims against Sheriff Bradshaw and Adams. Deputy Custer's version of events was in direct contravention to the forensic evidence located on scene, including, but not limited to, allegations that Adams was reaching into his vehicle at the time of the shooting and that Adams grabbed Deputy Custer around the neck. Plaintiffs alleged that PBSO failed to explore any physical evidence at the scene or interview any witnesses that contradicted Custer's version of what happened, including, but not limited to, a wet spot in the parking lot indicating another vehicle was at the scene and a witness who reported that prior to the shooting everything was normal and Adams was unarmed. The parties took this matter to trial. Mid-trial, and outside the ears of the jury, the Honorable Judge Daniel T.K. Hurley verbally reprimanded PBSO indicating "The investigation from beginning to end has been slip-shod and shoddy…It's a disgrace." Judge Hurley further stated "There is one thing after another that was not done… It's just amazing that they were not done." The case went to the jury but ultimately resulted in a mistrial. Thereafter, the parties resolved this matter outside of court. The monetary settlement of $2,500,000.00 was reported in the Palm Beach Post.

q.      In *Arango v. Bradshaw, Suszczynski, et al*, 9:13-cv-80912-DMM, Plaintiff brought Excessive Force counts pursuant to 42 U.S.C. §1983 and wrongful death counts against PBSO and Deputy Michael Suszcynksi. The plaintiff alleged that on or about June 7, 2012, in Boynton Beach, Florida, PBSO Deputies including Deputy Suszcynksi responded to a fight in the parking lot of a sports bar. The fight did not involve Arango, yet when the Deputy Suszcynksi responded to the scene, he through Arango on the floor and shot and killed Arango while he lay on the ground in a subdued manner. At no time was Arango noncompliant or combative. PBSO took no disciplinary action against Deputy Suszcynksi who inflicted this deadly and excessive force, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The parties resolved this matter outside of court. The total monetary settlement of $350,000.00 was reported in the Palm Beach Post.

r.      In *Camberdella v. Bradshaw and Goldstein*; Case No.9:14-CV-81258-MIDDLEBROOKS/BRANNON, Plaintiffs alleged that on or about October 4, 2012, in Boynton Beach, Florida, Deputy William Goldstein shot and killed an 18-year-old autistic and bipolar boy, Michael Camberdella, whose mother called to seek medical attention for Camberdella. The PBSO Deputy shot eleven (11) rounds at the unarmed autistic boy who allegedly threw lava rocks at the deputy, fatally wounding him with a bullet to the heart. Plaintiff brought claims against PBSO and the deputies involved for constitutional violations under 42 U.S.C. § 1983, wrongful death, and other state court claims. PBSO took no disciplinary action against Deputy Goldstein who inflicted this deadly and excessive force, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with persons who suffer

28

from mental illness. The parties resolved this matter outside of court. The monetary settlement of $1,700,000.00 was reported in the Palm Beach Post.

s.      In *Alvarez v. McGehee, and PBSO*, Case No.4-81068-CIV-DIMITROULEAS/SNOW, Plaintiff brought claims against PBSO and Deputy Joshua McGehee for constitutional violations under 42 U.S.C. § 1983, battery, negligent use of a firearm, negligent retention, and negligent hiring. Plaintiffs alleged that, on or about May 8, 2013, Deputy Joshua McGehee shot and unlawfully arrested of Aldo Alvarez, a 37 year old male who is mentally handicapped, suffers from Schizophrenia, and has been declared legally and mentally incompetent. The shooting occurred while McGehee was off duty and at his home. McGehee was having a conversation with his neighbor, Aldo Alvarez, when without provocation or incitement, McGehee drew his PBSO issued firearm and began screaming verbal commands at Alvarez. McGehee then proceeded to discharge his firearm ten (10) times at a fully compliant and non-resistant Alvarez, striking Alvarez with six (6) bullets and critically wounding him. McGehee fabricated a version of events that suggested McGehee acted in self-defense after Alvarez had barged into his garage and cornered him. The physical evidence and eye witness account of Alvarez's mother made entirely clear that McGehee's version of events could not have possible occurred. Despite the directly contradictory evidence, a determination was made by Internal Affairs that Deputy McGehee followed all policies and procedures of PBSO and was cleared of all wrongdoing in this fatal shooting. Deputy McGehee did not receive any discipline, training, or reprimand due to the custom, practice, and policy of using unnecessary excessive force during encounters with persons who suffer from mental illness. The parties resolved this

matter outside of court. The monetary settlement of $600,000.00 was reported in the Palm Beach Post.

t.     In *Stephens v. Bradshaw and Lin*; 9:14-cv-80425-COHN-SELTZER, Plaintiff brought Excessive Force counts pursuant to 42 U.S.C. §1983 against PBSO and Deputy Lin, as well as battery, negligent use of a firearm and negligent training claims against PBSO. The plaintiff alleged that on or about September 13, 2013, in West Palm Beach, Florida, Deputy Lin followed Stephens who was talking on his cell phone while riding on his bike. Stephens realizing he was being followed, got off his bicycle and walked towards Deputy Lin. Four seconds later Deputy Lin shot at the unarmed Stephens four times striking him and ultimately causing his paralyzation. Deputy Lin alleged he ordered Stephens to get on the ground and when he refused to comply and saw a black object in his hand (the individual's cell phone) he opened fire. However, Deputy Lin's dashboard camera directly contradicts that any commands were given or that Stephens refused to comply. Yet, the shooting was determined justified on the scene and Deputy Lin was cleared to return to work four days later. A later determination was made by Internal Affairs that Deputy Lin followed all policies and procedures of PBSO and was cleared of all wrongdoing in this shooting. Deputy Lin did not receive any discipline, training, or reprimand. However, a jury sitting in Palm Beach County determined that Deputy Lin's intentional use of force was excessive and unreasonable. The jury awarded compensatory damages in the amount of $23,148,100.00.00 to Dontrell Stephens.

u.     In *Pollow v. Bradshaw and Rosenthal*, Case No.9:15-cv-80521-DMM, Plaintiff brought claims against PBSO and Deputy Evan Rosenthal for constitutional violations under 42 U.S.C. § 1983 and asserting a wrongful death count. Plaintiff alleged that, on or

about April 4, 2014, in Boca Raton, Florida, PBSO Deputies encountered an individual suffering from mental health issues (bipolar disorder and schizophrenia) who had run out of his medication. The responding Deputy encountered the individual standing beside a vehicle and ordered him to remove his hands from his pockets. When the individual removed a screwdriver from his pocket, the PBSO Deputy fired his weapon and killed the individual. Deputy Rosenthal alleged that Pollow had raised the screwdriver above his head when he shot at him. However, another deputy on scene made clear that Pollow never raised his hands above his waste. Yet, PBSO took no disciplinary action against Deputy Rosenthal who inflicted this deadly and excessive force, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with persons who suffer from mental illness. The parties resolved this matter outside of court. The monetary settlement of $562,500.00 was reported in the Palm Beach Post.

v.   In *Williams v. PBSO and Cantu*, Case No.9:16-cv-80517-DMM, Plaintiff brought claims against PBSO and Deputy Ernest Cantu for constitutional violations under 42 U.S.C. § 1983 and asserting a wrongful death count. Plaintiff alleged that, on or about April 7, 2014, in West Palm Beach, Florida, Deputy Cantu responded to the apartment of a mentally-ill individual, Tinoris Williams. Deputy Cantu had previously, on numerous occasions, responded to William's residence pursuant to a Baker Act certificate. The Plaintiff alleged that after the PBSO deputies and Deputy Cantu had left the apartment complex, Deputy Cantu returned to Williams' apartment and shot him multiple times including once in the head. Deputy Cantu presented a fabricated story that Williams was suspected of being an armed burglar in the residence. However, William's mother indicated

31

that Cantu had previously indicated to her that Cantu "would make sure he took Tinoris off the streets." Additionally, Cantu had made posts on his personal Facebook page about killing mentally-ill people. Sheriff Bradshaw held an immediate press conference supporting the version of events as presented by Deputy Cantu. PBSO took no disciplinary action against Deputy Cantu who inflicted this deadly and excessive force, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with persons who suffer from mental illness. The parties resolved this matter outside of court. The monetary settlement of $300,000.00 was reported in the Palm Beach Post.

62.     Each of the enumerated similar incidents resulted in the filing of a complaint with PBSO's Internal Affairs Department which ultimately cleared the deputy or deputies involved finding the deputy's or deputies' actions to be justified. Notwithstanding such a determination by Internal Affairs, a number of these similar incidents led to lawsuits which resulted in the payment of awards or settlements by PBSO and served to put PBSO on notice of the need for better policies, procedures, customs, and practices and the numerous deficiencies in PBSO's approach to the use of force, particularly in officer involved shootings and encounters with persons who suffer from mental illness.

63.     Between the years 2000 and 2015, PBSO Deputies shot and killed 45 people and wounded 38 others. Of these 83 shootings, 82 were found by PBSO to be justified, often following little or no investigation.

64.     As reported by the Palm Beach Post, in 2016 and 2017 alone, PBSO paid over $4.5 million in settlements for excessive force claims, which eclipsed the $1.7 million the agency spent to settle similar lawsuits in the previous 16 years.

65.     Since 2010, PBSO has cleared officers of one hundred percent of all shootings, meaning that PBSO found <u>all</u> shootings were justified. This perfect clearance rate is suspiciously high, as the Palm Beach Post has reported that other law enforcement agencies in South Florida have clearance records far below 85%. In fact, Miami Police Department was investigated by the Department of Justice, which found that an 87% clearance rate was so unrealistic that it was a major factor in determining that the police department was using unconstitutional excessive deadly force.

66.     The trend of increased use of force shows no sign of letting up. PBSO is on notice of this trend but has not acted to stop it. PBSO has created a Post-Critical Incident Assessment Team to meet, discuss, and evaluate shootings, but the team is directed to produce no formal reports and draw no official conclusions. Instead, a collection of notes and informal observations are forwarded to PBSO's attorneys in anticipation of litigation. It is thus, by design, incapable of determining whether an officer involved in a shooting is in need of training, discipline, or other remedial action. Moreover, PBSO's training division does not conduct formal reviews of officer involved shootings.

67.     In October 2010 and again in April 2015, the Palm Beach Post published lengthy articles about the rash of police shootings and the lack of thorough investigations. The April 2015 articles were published following a joint investigation with WPTV 5 and resulted in numerous stories highlighting PBSO's excessive use of force. This joint investigation (entitled "Line of Fire") resulted in the publishing of a database of PBSO officer involved shootings, particularly highlighting the most questionable uses of force (many of which are detailed above). Through this public reporting, PBSO was further placed on notice of numerous deficiencies in PBSO's approach to the use of force, particularly officer involved shootings.

68.     PBSO, through Sheriff Bradshaw or other spokesmen, routinely makes public statements, shortly after an officer involved shooting or other use of force, usually at the scene of the use of force, relying solely on the statement of the deputy involved in the shooting, justifying and/or defending its Deputies' actions. The Palm Beach Post has even posted a compilation of Sheriff Bradshaw's statements made from the scene of these shootings unanimously reiterating that the involved PBSO deputy's actions were justified. These statements are made prior to the collection of all evidence, the interviewing of all witnesses, the completion of a walkthrough/reenactment and/or the completion of investigations. These statements send the message to PBSO Deputies that the use of deadly and excessive force is condoned without any serious review of or regard for justification, and will not result in any adverse consequences. This message is strongly reinforced when PBSO declares a shooting or excessive use of force "justified" with little or no investigation, formally ratifying the Deputies' conduct.

69.     Despite the fact that PBSO's Internal Affairs division and/or Sheriff Bradshaw issue a statement to the involved officers and the public that the level of force used and actions taken were justified, in many of these instances a separate undisclosed determination is actually made that the involved officer's use of force and actions taken were not proper.

70.     PBSO has maintained a long-standing, widespread history of failure to train, supervise, or otherwise discipline its police officers for among other things, the use of excessive force, unlawful detentions, unlawful arrests, and the improper treatment of persons who suffer from mental illness even though it had notice of this unlawful conduct by its employees and the public.

71.     PBSO has maintained a system of review of complaints and incidents involving abuses of lawful authority such as the illegal use of force, unlawful detention, unlawful arrests,

and the improper handling of incidents involving persons who suffer from mental illness, by sworn law enforcement officers, which has failed to identify improper use of force by officers. As a result of PBSO's failure to subject police officers who employed such acts to discipline, closer supervision, and/or retaining, it has become the de facto policy and custom of PBSO to tolerate such acts by its officers.

72.     Indeed, PBSO routinely performs cursory investigations of incidents involving extremely questionable use of deadly and excessive force on the part of PBSO Deputies, with an eye toward exonerating the Deputy involved rather than finding out the truth. Almost uniformly, investigating officers and supervisors uncritically endorse the Deputies' versions of events based solely upon the involved deputies' accounts of those events, even when those versions are incomplete, inconsistent, or are in direct contradiction of objective evidence. The result is that these incidents involving questionable use of force are not properly and impartially investigated, documented, or addressed with corrective measures where warranted.

73.     Due to this intentionally inadequate investigative process, in virtually all officer involved shootings and excessive force incidents, PBSO has declared the conduct of its Deputies to be justified, particularly in those involving persons who suffer from mental illness.

74.     The foregoing acts, omissions, policies, or customs of PBSO caused law enforcement officers, including RIGNEY, to believe that acts such as the improper use of force, unlawful detentions, unlawful arrests, and the improper handling of incidents involving persons who suffer from mental illness would not be properly investigated. The consistent lack of accountability within PBSO for the questionable and often unjustifiable use of deadly and/or excessive force has promoted an acceptance of disproportionate, aggressive, and unconstitutional behavior towards ordinary citizens. The resulting culture of aggression both promotes and

35

condones intimidating and harsh approaches toward the citizenry, with the excessive use of force as a frequent and foreseeable outcome.

75.     Despite the notice and knowledge of PBSO as to the dangerous propensities of their sworn law enforcement officers because of said officers' lack of training, skill and/or experience, PBSO failed to implement any policies or programs to train said officers or otherwise intentionally failed to protect the public, including WHIDDEN, from its danger.

76.     PBSO had policies, customs, and practices that constituted deliberate indifference to Plaintiff's Constitutional Rights pursuant to the Fourth and Fourteenth Amendments  and PBSO's policy and custom which caused the violation of WHIDDEN's rights and/or was the moving force behind such unconstitutional violations as indicated by the facts and evidence described above.

77.     PBSO's deliberate indifference towards WHIDDEN and persons who suffer from mental illness led to RIGNEY and the other responding PBSO Deputies failing to provide medical attention and crisis intervention. Instead RIGNEY with his Police K-9 and other PBSO Deputies chased WHIDDEN with their guns drawn, forcibly shot WHIDDEN in the chest first with non-lethal bullets, then forcibly shot WHIDDEN with at least three (3) lethal bullets striking him in the arms and back, and instructed RIGNEY's Police K-9 to viciously chew and bite at WHIDDEN's face.

78.     The policies, customs, and practices complained of include, but are not limited to, the following:

     a.     Deliberate indifference by failing to adequately screen deputies and by failing to follow hiring protocols for sworn law enforcement officers;

     b.     Deliberate indifference by improperly training PBSO Deputies in such a

way that condones, encourages, and permits their officers and agents to violate the rights and inflict harm upon persons being arrested;

      c.      Deliberate indifference by improperly training PBSO Deputies in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict harm upon persons who suffer from mental illness that they encounter;

      d.      Deliberate indifference in failing to properly supervise PBSO Deputies in their encounters with persons they arrest;

      e.      Deliberate indifference in failing to have Deputies properly reviewed for accurate use of force of incidents involving force used against arrested persons and persons who suffer from mental illness, with conclusions frequently permitted to be drawn on the basis of clearly incorrect or contradictory information;

      f.      Deliberate indifference in failing to determine whether said employees, including RIGNEY, posed a threat to the public as a result of their propensity to commit unlawful acts; and,

      g.      Deliberate indifference by retaining and failing to discipline employees even after a determination was made that said employees are a danger to the public.

79.      PBSO was grossly and willfully negligent in the selection and/or training and/or supervision and/or retention of RIGNEY, as a sworn law enforcement officer of the PBSO, in that:

      a.      It failed to properly screen RIGNEY when he was hired as sworn law enforcement officer.

      b.      It appointed RIGNEY as a sworn law enforcement officer when it knew or, in the exercise of reasonable care, should have known, of the disposition of RIGNEY, to engage in such unlawful conduct.

37

      c.     Despite the fact that it knew or should have known that this pattern of conduct was being carried out by its agents and employees, PBSO has failed to and refused to:

        i.   Remove RIGNEY from his position as a sworn law enforcement officer;

      ii.   Take any disciplinary action against RIGNEY;

    iii.   Provide any retraining to RIGNEY; and,

    iv.   Provide redress for citizens, such as WHIDDEN, who have been injured thereby.

80.    PBSO's deliberate indifference, failure to train, failure to effectively supervise, and permission and toleration of, the patterns and practices enumerated above, were the moving forces causing the serious injuries to Plaintiff and the violation of Plaintiff's Constitutional Rights.

81.    The actions of  RIGNEY in this case, as well as the actions of PBSO in this case and other similar situations, indicate that the individuals who violated WHIDDEN's rights in this case acted in accordance with PBSO's policies and reflect policies that were adopted by PBSO and their high-ranking officials.

82.    The failure of PBSO to competently investigate use of force incidents and encounters with persons who suffer from mental illness, and to institute appropriate disciplinary and retraining action in the wake of them, serves to tacitly condone the egregious misconduct of the Deputies involved. The agency's inaction in this regard effectively annuls its official general orders regarding the use of force and substitutes in their place a permissive de facto policy and custom of tolerating excessive force, which will invariable have the effect of promoting similar misconduct by other deputies in the future. In sum, the pattern and practice of the excessive use of

force on the part of PBSO Deputies stems from systemic deficiencies in training and supervision and from the inadequate investigation and routine ratification of deadly and excessive force.

## COUNT I
## WRONGFUL DEATH ACTION
## DEFENDANT PBSO

83.     Plaintiff, DAYNA CHRISTINE CLAWSON, as Personal Representative of the Estate of RICKY KEVIN WHIDDEN, deceased, realleges the allegations contained in Paragraphs 1 through 8, 10 through 51, 56, 74 through 75, and 77 through 82 as if fully set forth herein.

84.     Plaintiff files this cause of action pursuant to the Florida Wrongful Death Act.

85.     The survivors include Owen Whidden and Dianne Whidden, surviving parents and G.W., B.W, and P.W, Minor Children.

86.     On December 31, 2016, Defendant RIGNEY shot WHIDDEN, intentionally and against the will of WHIDDEN.

87.     WHIDDEN suffered a harmful and offensive contact when he was shot by Defendant RIGNEY, and died as a result.

88.     The conduct of Defendant RIGNEY was committed within the course and scope of his employment with Defendant PBSO.

89.     Defendant RIGNEY utilized deadly force upon WHIDDEN when non-deadly force was reasonable and appropriate under the circumstances.

90.     At all material times, Defendant, PBSO, had a duty to act reasonable to the public, including, but not limited to individuals such as WHIDDEN.

91.     At all material times, the Defendant, PBSO, through its employees, agents and/or apparent agents, including but not limited to Deputy RIGNEY, was below the standard of care, and acted in a tortious and negligent manner as follows:

39

a.      Using deadly force upon WHIDDEN, when non-deadly force was reasonable and appropriate under the circumstances;

b.      Failure to be trained to use proper police technique during arrests of persons suffering from mental illnesses;

c.      Failing to provide medical attention or crisis intervention to an individual known to be suffering from a mental illness;

d.      Failing to utilize non-deadly force in a situation that required such use;

e.      RIGNEY with his Police K-9 and other PBSO Deputies chasing WHIDDEN with their guns drawn, forcibly shooting WHIDDEN in the chest first with non-lethal bullets, then forcibly shooting WHIDDEN with at least three (3) lethal bullets striking him in the arms and back, and instructing RIGNEY's Police K-9 to viciously chew and bite at WHIDDEN's face.  .

f.      Failing to follow policies and procedures regarding use of deadly and non-deadly force;

g.      Under all the circumstances failing to act reasonably, including using deadly force when such force should and could have been avoided if acting as a reasonable and prudent law enforcement officer.

92.      As a direct and proximate result of the above actions of Defendant RIGNEY and Defendant PBSO through its employees, agents and/or apparent agents, including but not limited to Deputy JUSTIN RIGNEY, WHIDDEN was wrongfully killed.

93.      DAYNA CHRISTINE CLAWSON, as Personal Representative of the Estate of RICKY KEVIN WHIDDEN, alleges all damages recoverable under wrongful death statute, including but not limited to the mental pain and suffering, which will continue to suffer for the rest

of the survivors' lives, the loss of services and support of WHIDDEN, loss of net accumulations to the estate that would have been left as part of his estate if he had survived and lived his normal life expectancy, the funeral expenses as a result of WHIDDEN's death, and the loss of WHIDDEN's love and companionship.

94.     As a direct and proximate result of the acts of Defendant PBSO, decedent WHIDDEN's survivors, Owen Whidden and Dianne Whidden, surviving parents and G.W., B.W., and P.W, Minor Children, have sustained the following damages:

    a.  They have, in the past and will in the future, suffer great mental pain and suffering.

    b.  They have, in the past and will in the future, suffer the loss of parental companionship, instruction, and guidance.

    c.  They have, in the past and will in the future, be deprived of the support and services of their father, the decedent.

WHEREFORE, Plaintiffs pray for the following relief:

a.      Judgment for damages against Defendant PBSO;

b.      Trial by jury as to all issues so triable; and

c.      Such other relief as this Honorable Court may deem just and appropriate.

## COUNT II
## WRONGFUL DEATH ACTION
## DEFENDANT RIGNEY

95.     Plaintiff, DAYNA CHRISTINE CLAWSON, as Personal Representative of the Estate of RICKY KEVIN WHIDDEN, deceased, realleges the allegations contained in Paragraphs 1 through 7, 9 through 35, 38 through 41, 47, and 45 through 51 as if fully set forth herein.

96.     Plaintiff files this cause of action pursuant to the Florida Wrongful Death Act.

97.     The survivors include Owen Whidden and Dianne Whidden, surviving parents and G.W., B.W, and P.W, Minor Children.

98.     On December 31, 2016, Defendant RIGNEY shot WHIDDEN, intentionally and against the will of WHIDDEN.

99.     WHIDDEN suffered a harmful and offensive contact when he was shot by Defendant RIGNEY, and died as a result.

100.    Defendant RIGNEY utilized deadly force upon WHIDDEN when non-deadly force was reasonable and appropriate under the circumstances.

101.    DAYNA CHRISTINE CLAWSON, as Personal Representative of the Estate of RICKY KEVIN WHIDDEN, alleges all damages recoverable under wrongful death statute, including but not limited to the mental pain and suffering, which will continue to suffer for the rest of the survivors' lives, the loss of services and support of WHIDDEN, loss of net accumulations to the estate that would have been left as part of his estate if he had survived and lived his normal life expectancy, the funeral expenses as a result of WHIDDEN's death, and the loss of WHIDDEN's  love  and companionship.

102.    As a direct and proximate result of the acts of Defendant RIGNEY, decedent WHIDDEN's survivors, Owen Whidden and Dianne Whidden, surviving parents and G.W., B.W, and P.W, Minor Children, have sustained the following damages:

d.  They have, in the past and will in the future, suffer great mental pain and suffering.

e.  They have, in the past and will in the future, suffer the loss of parental companionship, instruction, and guidance.

f.   They have, in the past and will in the future, be deprived of the support and services of their father, the decedent.

WHEREFORE, Plaintiffs pray for the following relief:

a.    Judgment for damages against Defendant RIGNEY;

b.    Trial by jury as to all issues so triable; and

c.    Such other relief as this Honorable Court may deem just and appropriate.

## COUNT III
## 42 U.S.C. § 1983 – Excessive Use of Force by Defendant RIGNEY

103.    Plaintiff realleges the allegations contained in Paragraphs 1 through 7, and 9 through 35, 38 through 41, and 45 through 49, as if fully set forth herein.

104.    This is an action for damages against Defendant RIGNEY for the deprivation of WHIDDEN's Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

105.    The deadly force used by Defendant RIGNEY against WHIDDEN during the course of WHIDDEN's arrest was objectively inhuman and unnecessary, and constituted the unreasonable and excessive use of force in violation of WHIDDEN's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

106.    Defendant RIGNEY used unreasonable and excessive force against WHIDDEN when, instead of providing medical attention and crisis intervention, WHIDDEN was chased by Deputies, including RIGNEY with his Police K-9, forcibly shot WHIDDEN in the chest with non-lethal bullets, forcibly shot by RIGNEY with at least three (3) lethal bullets striking him in the arms and back, and had his face viciously attacked by RIGNEY's Police K-9.

107.    Defendant RIGNEY committed the acts described hereinabove in a gross disregard of Plaintiff WHIDDEN's constitutional rights while acting under color of law, and specifically deprived WHIDDEN of his constitutional right to be free from excessive police force under the

Fourth Amendment.

108.    No reasonable officer, confronted with the facts and circumstances confronting Defendant RIGNEY, would have believed that the force used on WHIDDEN on December 31, 2016 was objectively reasonable and not in violation of WHIDDEN's clearly established rights under the Fourth Amendment.

109.    Defendant RIGNEY acted knowingly, intentionally, and maliciously, and/or with a reckless or callous indifference to the federally protected rights of WHIDDEN.

110.    As a result of Defendant RIGNEY's conduct, WHIDDEN suffered physical injury, pain, suffering, emotional distress, disability, and death.

111.    As a result of WHIDDEN's injury and death, Plaintiff is entitled to recover all damages allowable for violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs pray for the following relief:

a.      Judgment for compensatory damages;

b.      Judgment for exemplary or punitive damages;

c.      Cost of suit;

d.      Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.      Trial by jury as to all issues so triable; and

f.      Such other relief as this Honorable Court may deem just and appropriate.

**COUNT IV**
**42. U.S.C. § 1983 Claim against Defendant PBSO**

112.    Plaintiff realleges the allegations contained in Paragraphs 1 through 8, and 10 through 82, as if fully set forth herein.

113.    Defendant RIGNEY, while acting under color of law, deprived WHIDDEN of rights and privileges secured to him by the Constitution and laws of the United States, in violation

44

of 42 U.S.C. § 1983.

114.    Defendant RIGNEY knew or should have known that WHIDDEN was suffering from a mental illness, and should have known that any use of force was objectively unreasonable in light of the totality of the circumstances.

115.    The force used by Defendant RIGNEY against Plaintiff during the course of WHIDDEN's arrest was objectively inhuman and unnecessary and constituted the unreasonable and excessive use of force, in violation of the Plaintiffs' clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

116.    At no time was WHIDDEN under suspicion of committing a serious crime. WHIDDEN was knowingly a person suffering from mental illness.  At no time did WHIDDEN pose an immediate threat of violence to Defendant RIGNEY or any other person.

117.    No reasonable officer, confronted with the facts and circumstances confronting Defendant RIGNEY, would have believed that the force used on WHIDDEN on December 31, 2016 was objectively reasonable and not in violation of WHIDDEN's clearly established rights under the Fourth Amendment.

118.    The actions and omissions of Defendant RIGNEY resulted in violations of WHIDDEN's Fourth Amendment Rights, when, instead of providing medical attention and crisis intervention, WHIDDEN was chased by Deputies, including RIGNEY with his Police K-9, forcibly shot WHIDDEN in the chest with non-lethal bullets, forcibly shot by RIGNEY with at least three (3) lethal bullets striking him in the arms and back, and had his face viciously attacked by RIGNEY's Police K-9.

119.    PBSO's chief policy maker, Sheriff Bradshaw, is responsible for the implementation and promulgation of official policies for PBSO.  Further, Sheriff Bradshaw is

responsible for the promulgation of rules, practices, policies, and procedures for the efficient maintenance, supervision, and control of PBSO Deputies and the implementation of training to maintain an effective police force that is capable and prepared to deal with encounters with unarmed and non-threatening individuals.

120.    Defendant PBSO violated the Plaintiffs' Fourth Amendment rights by failing to train its deputies to reasonably respond to persons suffering from mental illnesses and by engaging in policies and practices that caused constitutional violations to persons suffering from mental illnesses by inappropriately responding to non-threatening situations with excessive and/or deadly force.

121.    These constitutional deprivations were further caused by Defendant PBSO's lack of training and supervision as to its deputies having the ability and knowledge to appropriately interact with persons suffering from mental illnesses without causing death or physical injury.

122.    Defendant PBSO violated WHIDDEN's Fourth Amendment freedom from being subjected to excessive force and Fourteenth Amendment substantive due process when PBSO failed to adequately train deputies/officers to respond to calls involving persons suffering from mental illnesses

123.    PBSO was deliberately indifferent to its responsibility to adequately prepare its deputies/officers for encounters with persons suffering from mental illnesses and for their interaction with, detention, and arrest of the same.

124.    PBSO has had a history of similar violations by its Deputies who were not properly trained to reasonably and properly respond to persons suffering from mental illnesses.

125.    These similar incidents include, but are not limited to, those which are specifically enumerated in Paragraphs 38 through 41, 45 through 48, and 59 through 64 of this Complaint.

Many of these similar incidents resulted in the filing of a complaint with PBSO's Internal Affairs' Department, and a number of these similar incidents led to lawsuits resulting in the payment of awards or settlements by PBSO.

126.    These complaints, incidents, and lawsuits served to put Defendant PBSO on notice and provided subjective knowledge of Defendant PBSO's need for better policies, procedures, customs, and practices as to the numerous deficiencies in Defendant PBSO's approach to the use of force, particularly in officer-related shootings and encounters with persons suffering from mental illnesses.

127.    As illustrated in Paragraphs 38 through 41, 45 through 48, and 59 through 64 of this Complaint, the incidents, shootings, and litigation history involving Defendant RIGNEY specifically put Defendant PBSO on notice of Defendant RIGNEY's unfitness for duty as a sworn deputy and provided subjective knowledge of Defendant PBSO's need for better policies, procedures, customs, and practices as to the numerous deficiencies in Defendant RIGNEY's approach to the use of force, particularly when involved in officer-related shootings and encounters with persons suffering from mental illnesses.

128.    Furthermore, Defendant PBSO's lack of training for their Deputies in how to reasonably and properly respond to persons suffering from mental illnesses created an obvious warning that a constitutional violation would result due to the high percentage of encounters between PBSO deputies and persons suffering from mental illnesses.

129.    Defendant PBSO, through its policy custom, or usage, also hired deputies who were substandard and who were not properly trained and disciplined, including Defendant RIGNEY.

130.    PBSO knew or should have known, due to the large number of persons suffering from mental illnesses in Palm Beach County and the large number of situations where such

individuals are encountered and arrested, that its deputies/officers would routinely encounter persons suffering from mental illnesses and that these deputies/officers would need to be aware of the appropriate methods for the detention and/or arrest of a person suffering from a mental illness.

131.   PBSO is charged with properly training officers with the available and necessary non-deadly-force skills that would allow officers to investigate a situation involving persons suffering from mental illnesses and also maintain their own safety.

132.   PBSO was deliberately indifferent to its responsibility to create an effectively trained police force that could adequately respond to the scene of encounters with persons suffering from mental illnesses.  All of the conduct at the scene to investigate the WHIDDEN's situation was contrary to established police methods for interacting with persons suffering from mental illnesses.

133.   Thus, Defendant RIGNEY was not sufficiently trained to reasonably and effectively deal with his encounter with a mentally-ill WHIDDEN.  All of the acts and omissions of Defendant RIGNEY were inappropriate to the situation and caused the encounter to be escalated.

134.   Further, Defendant RIGNEY was not provided with sufficiently detailed policies and procedures to use in investigating a situation involving persons suffering from mental illnesses.  Defendant RIGNEY did not have the adequate direction or assistance with which to respond to the incident that occurred on December 31, 2016.

135.   All of the above referenced failures are the responsibility of PBSO, which was deliberately indifferent to its responsibility to have appropriate policies and procedures in place and to train and supervise officers employed by PBSO to deal with the recurring situation of responding to calls involving persons suffering from mental illnesses.

136.     Defendant PBSO ratified the misconduct of Defendant RIGNEY against WHIDDEN including the use of excessive force, by failing to discipline Defendant RIGNEY, failing to conduct an adequate shooting investigation, and/or covering up Defendant RIGNEY's misconduct.

137.     As a result of Defendant PBSO's conduct, WHIDDEN suffered physical injury, pain, suffering, emotional distress, disability, and death.

138.     As a result of WHIDDEN's injury and death, Plaintiff is entitled to recover all damages allowable for violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs pray for the following relief:

a.       Judgment for compensatory damages;

b.       Judgment for exemplary or punitive damages;

c.       Cost of suit;

d.       Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.       Trial by jury as to all issues so triable; and

f.       Such other relief as this Honorable Court may deem just and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

(a)     Declare that Defendants' acts and conduct constituted violations of the Fourth and Fourteenth Amendments of the U. S. Constitution under 42 U.S.C. §§ 1983.

(b)     Judgment in Plaintiff's favor as to all claims for relief.

(c )     Award compensatory damages.

(d)     Award punitive and exemplary damages, pre-judgment interest, post-judgment interest, costs, and other reasonable expenses incurred in maintaining this action, and the reasonable attorney's fees and costs incurred in maintaining this action.

(e)     All other relief in law or equity to which Plaintiff is entitled and that the Court

deems equitable, just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues within this Complaint.

Dated: July 11, 2017

RESPECTFULLY SUBMITTED

By**:   /s/ Stuart N. Kaplan**
STUART N. KAPLAN, ESQUIRE
Florida Bar No.: 0647934
JOSEPH G. SCONZO, ESQUIRE
Florida Bar No.: 0508720
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**KAPLAN & SCONZO, P.A.**
3399 PGA Boulevard, Suite 150
Palm Beach Gardens, Florida 33410
Telephone: (561) 296-7900
Facsimile: (561) 296-7919
Emails: skaplan@kspalaw.com, jsconzo@kspalaw.com,
gsconzo@kspalaw.com, jwise@kspalaw.com